Judith W. Ross
State Bar No. 21010670
C. Luckey McDowell
State Bar No. 24034565
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Telephone: 214.953.6500
Facsimile: 214.953.6503
Email: *judith.ross@bakerbotts.com*
*luckey.mcdowell@bakerbotts.com*

COUNSEL TO DEBTORS-IN-POSSESSION

David W. Parham
State Bar No. 15459500
Laurie Dahl Babich
State Bar No. 00796150
BAKER & MCKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Tel: 214.978.3000
Fax: 214.978.3099
Email: *david.w.parham@bakernet.com*
*laurie.d.babich@bakernet.com*

ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| CORBAN COMMUNICATIONS, INC. and COLORADO 4-19 NETWORK, INC., | § § § § | Case No. 04-32972-SAF-11 |
| Debtors. | § § § | Chapter 11 (Jointly Administered) |
| CORBAN COMMUNICATIONS, INC., COLORADO 4-19 NETWORK, INC., and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | § § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | Adversary No. 04-03543 |
| INTERNATIONAL COMMUNICATIONS GROUP, INC., | § § § § | |
| Defendant. | § § | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT; FOR AN ACCOUNTING, FOR DAMAGES; AND FOR TURNOVER OF PROPERTY AND APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

COMES NOW Corban Communication, Inc. (individually, "Corban"), Colorado 4-19 Network, Inc. (individually, "Colorado", but both Corban and Colorado being collectively

First Amended Complaint Against
International Communications Group, Inc.

Page 1 of 16

DAL02:416607.3

referred to as the "Debtors"), and the Official Committee of Unsecured Creditors (the "Committee") (the Debtors and Committee being collectively referred to as the "Plaintiffs"), and having previously filed a *Complaint for Declaratory Judgment; for an Accounting; for Damages; and for Turnover of Property and Application for a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction* dated September 10, 2004 (the "Original Complaint"), against International Communications Group, Inc. ("Defendant" or "ICG"), and now respectfully file this First Amended Complaint.

## THE PARTIES

1. Corban is a Texas corporation and a debtor in these proceedings. Colorado is a Colorado corporation and a debtor in these proceedings.

2. Defendant is a Nevada corporation, and can be served with process care of Robert Esty, President of ICG, 901 Jupiter Road, Plano, Texas 75074.

3. The Official Committee of Unsecured Creditors is a statutory committee appointed under Title 11 of the United States Bankruptcy Code and is a party in interest.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5. Plaintiffs filed the Original Complaint against International Communications on or about September 10, 2004. Plaintiffs now file this First Amendment to the Original Complaint pursuant to Federal Rule of Civil Procedure 15, as made applicable to this Adversary Action by Federal Rule of Bankruptcy Procedure 7015. Defendant has not yet filed a responsive pleading in this Adversary Action.

## BACKGROUND

6.  At a July 23, 2004 closing, Corban and Colorado sold substantially all of their assets to Defendant under an Asset Purchase Agreement, as modified by a term sheet (the "Final APA") previously approved by this Court. A true and correct copy of the Final APA approved by the Court (without the Schedules, which are voluminous) is attached hereto as Exhibit A.

7.  The Final APA was entered into and closed at the direction of this Court after Debtors obtained approval of an earlier version of the asset purchase agreement with Defendant (the "First APA"). This First APA differed significantly from the Asset Purchase Agreement originally filed with the Court on May 25, 2004, (the "Originally Filed APA"). At the first sale hearing on May 26, 2004, after which the Court orally approved the Originally Filed APA, this Court held extensive hearings on the proposed ICG sale, at which time, an agreement was announced on the record between 360 Networks, Global Crossing, the Debtors and ICG related to certain issues that were in dispute in connection with that sale hearing. Between May 26, 2004, and the date that the Originally Filed APA ultimately was scheduled to close, ICG demanded changes to significant and material portions of the Originally Filed APA and threatened litigation with all of the parties in order to obtain those material concessions. By way of example, in the Originally Filed APA, ICG agreed to be responsible for any operating losses suffered by the Debtors between the date of court approval of the Originally Filed APA and the date that the transaction closed. Those estimated operating losses for a month were roughly $600,000.00. ICG also renegotiated the amount of cure amounts they would have to pay in connection with the transaction. ICG's demands resulted in all of the parties agreeing on a compromise of those issues (as well as others) in order to get the transaction completed, the

provisions of which were set forth in a Term Sheet that this Court approved as part of the First APA. Notwithstanding the significant concessions made by the estates in an effort to complete a transaction with ICG, ICG wholly failed to close on the First APA and the estates teetered on the edge of administrative insolvency.

8. Upon ICG's failure to close under the First APA, the Court reopened the bidding process and rescheduled sales hearings the week of July 19 (the "Rescheduled Sale Hearings").

9. Because of ICG's prior conduct, the Debtors supported a transaction with ATN at the Rescheduled Sale Hearings over the more economically lucrative proposal of ICG. The Court ultimately approved the sale to ICG as higher and better than the offers by ATN and Republic/360 Networks.

10. The Debtors' unwillingness to back the sale to ICG was driven by the Debtors' lack of confidence in ICG's ability to complete the transaction and the belief that ICG would either fail to close the transaction on the terms approved by the Court, or would close the transaction and then litigate with the estates. Unfortunately, some of the Debtors' predictions have come true. After this Court approved the sale to ICG under certain defined terms at the Rescheduled Sale Hearings, ICG demanded that the estates capitulate to their demand that certain material provisions of the Final APA approved by this Court be renegotiated. Specifically, ICG attempted to renegotiate the portions of the Final APA which defined "Retained Assets". The Retained Assets were assets which the bankrupt estates retained and which were not part of the sale. Debtors refused to capitulate to these demands and the transaction closed.

11. The Final APA explicitly provides in paragraph 2.2(b) that Debtors did not sell or convey to ICG "Account Receivables, notes receivable and miscellaneous receivables of the Business arising prior to the Closing Date, *provided, however,* that all post-petition Account Receivables, notes receivable and miscellaneous receivables of the Business arising prior to the Closing Date retained by Sellers under this Section 2.2(b) shall not exceed $2,300,000". In the telecommunications industry, clients are billed one month in advance for services to be performed the following month. Accordingly, prior to the July 23 Closing, Debtors had placed certain receivables on its books for services that would not be performed until after July 23 (hereinafter, the "August Receivables"). The August Receivables arose prior to the Closing Date. At the Closing, ICG demanded that the estates agree that the August Receivables belonged to them notwithstanding the clear language of the Final APA.

12. Indeed, ICG knew full well from the negotiations in the period preceding the failed first closing how Debtors were interpreting the term "Account Receivables" since ICG attempted to renegotiate that language without success to make it explicitly clear that the August Receivables did not constitute a retained asset under the Final APA. Further, had ICG done the most rudimentary of due diligence and reviewed Debtors' audited accounting records, they would have known how Debtors accounted for these receivables. Accordingly, any suggestion that the term "Account Receivables" in the Final APA does not include the August Receivables is specious.

13. Fearful that after closing the transaction ICG would keep the August Receivables if it collected them, the Committee demanded that ICG agree to execute an Escrow Agreement in which the proceeds of the August Receivables would be placed. ICG agreed to establish such an escrow, but has wholly failed to deposit those sums with the Debtors for

deposit into such Escrow. While it has executed the escrow agreement, ICG has failed to deliver to the Committee the documentation necessary to establish the escrow account. Indeed, ICG has held checks for more than a month after the Closing without depositing them, despite the estates' demand that said sums be turned over to the estate

14. After the filing of the Original Complaint, Plaintiffs were made aware of additional actions taken by Defendant that should be addressed in this Adversary Action.

15. In particular, Defendant is in possession of approximately 18 vehicles (the "Estate Vehicles") that are property of the estate. A list of the Estate Vehicles is set forth on Exhibit B attached hereto. The Estate Vehicles were retained assets under the Final APA, and accordingly, the Estate Vehicles remain property of the Estate.

16. Additionally, ICG has refused to reimburse the Debtors for actual costs incurred by the Debtors in assuming additional contracts that were not listed on the Final APA. Per the terms of the Final APA, the Debtors were required to pay the cure costs of only those specified executory agreements that were listed in the Final APA. ICG had no open ended right to require the addition of contracts to be assumed, although the Debtors agreed to assume additional contracts, if possible, at ICG's request. In such an event, however, ICG would be liable for any cure costs associated with the assumption of such contracts.

17. In the last week of August, ICG and the Debtors had multiple discussions and meetings regarding ICG's need that additional executory contracts that were not listed on the Final APA be assumed. The Debtors were told by ICG that the assumption of these contracts was essential to the success of ICG and that ICG would fail as a business if the contracts were not assumed. At the request of ICG, the Debtors assumed and assigned the newly designated

contracts, and the Debtors also paid the cure costs associated with these new contracts (the "New Cure Costs"). The New Cure Costs totaled approximately $799,341.07.

### FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT

18. Plaintiffs reallege the allegations set forth in paragraphs 1 through 17 as though fully set forth herein.

19. This is a claim for declaratory relief brought under 28 U.S.C. §§ 2201 and 2202.

20. An actual controversy has arisen and now exists relative to the rights of the Plaintiffs and ICG with respect to the August Receivables. Plaintiffs contend that the estates retained the August Receivables under the Final APA and that those August Receivables are not owned by ICG. ICG contends otherwise. Plaintiffs seek a declaratory judgment ruling that the August Receivables are indeed owned by the estates and not by ICG.

### SECOND CAUSE OF ACTION – BREACH OF CONTRACT

21. Plaintiffs reallege the allegations set forth in paragraphs 1 through 20 as though fully set forth herein.

22. As evidence by the attached Letter Agreement dated July 23, 2004 (Attached hereto as <u>Exhibit C</u>), ICG unequivocally agreed to deposit all August Receivables into an escrow account until such time as this Court had an opportunity to rule upon the issue of who owns the August Receivables. On information and belief, there are more than $250,000.00 in checks which constitute August Receivables which have not been cashed and which are sitting in a desk drawer at ICG's offices. Failure of ICG to turn over the proceeds of the August Receivables may well result in checks not being honored either because those checks were not timely deposited or because the customer in question might decide to stop payment on those

checks. Debtors seek monetary damages for any amounts held by ICG if those amounts are not ultimately collected due to ICG's breach of the Letter Agreement.

23. Further, under Section 8.10 of the Final APA, ICG is obligated to turn over certain payments received (the "Account Receivables") to Debtors on a regular basis. On information and belief, while such payments have been received by ICG, they have not been turned over.

### THIRD CAUSE OF ACTION: CONVERSION

24. Plaintiffs reallege the allegations set forth in paragraphs 1 through 23 as though fully set forth herein.

25. ICG has converted property of the estates inasmuch as the August Receivables and the Accounts Receivable are owned by Debtors.

26. Plaintiffs seek damages in an amount equal to the full amount converted by ICG.

### FOURTH CAUSE OF ACTION: REQUEST FOR TEMPORARY RESTRAINING ORDER; TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

27. Plaintiffs reallege the allegations set forth in paragraphs 1 through 26 as though fully set forth herein.

28. Plaintiffs contend further that, in any event, the proceeds of the August Receivables were to be paid over to an Escrow Account by agreement of the parties until such time as this Court ruled on the issue of who owned the August Receivables by virtue of the Letter Agreement. Accordingly, ICG has no right to hold said funds since they explicitly agreed to turn over the funds to an escrow agent and they have no right to retain these checks since the checks are payable to Debtors. Further, ICG has no right to hold the proceeds of the Account Receivables in light of the express language of Section 8.10 of the Final APA.

First Amended Complaint Against                                     Page 8 of 16
International Communications Group, Inc.

DAL02:416607.3

29. Plaintiffs request that the Court enjoin Defendant from cashing or otherwise disposing of the proceeds of the August Receivables and the Account Receivables and require Defendant to send those checks to the Debtors for cashing and for deposit into the escrow account, as is appropriate.

30. Plaintiffs have established that there is a likelihood of success on the merits of its Complaint inasmuch as (1) there is not any dispute that the parties have contractually agreed to place the proceeds of the August Receivables into the Escrow Account, regardless of the merits of Plaintiffs' underlying argument that it owns the August Receivables; and (2) there is not any dispute that ICG agreed under Section 8.10 of the Final APA to turn over the Account Receivables. If the proceeds of the August Receivables or the Account Receivables are disposed of, Plaintiffs have no adequate remedy at law.

31. If Plaintiffs are not granted a temporary restraining order, it is likely that they will suffer irreparable injury because, on information and belief, immediately after the closing of the sale transaction, and without Plaintiffs' knowledge, ICG was merged into Corban Towers, an entity that is admittedly insolvent. Consequently, there is a risk that if in fact a merger occurred, that Plaintiffs will not be able to retrieve the funds in question. In order to prevent said irreparable harm it is essential that this Court immediately issue a restraining order restraining ICG, its agents, employees, and representatives from cashing the checks in question or spending the proceeds of the August Receivables or the Account Receivables.

32. The threatened injury to Plaintiffs in the absence of a preliminary injunction or restraining order outweighs the damage that the granting of the injunction or restraining order might cause Defendant, particularly inasmuch as the Defendant already agreed (1) to deposit the proceeds of the August Receivables into an Escrow Account; and (2) to

turnover the proceeds of the Account Receivables to Debtors. In essence, ICG agreed before closing to put those sums aside so there can be no harm to ICG by enforcing such agreement.

33. A preliminary injunction would not adversely affect the public interest. Thus, after the issuance of a temporary injunction, Plaintiffs request that the Court preserve the status quo during the pendency of this action by having ICG appear before this Court and show cause why, during the pendency of this action, the Court should not convert the temporary restraining order into a preliminary injunction enjoining ICG, its respective agents, and representatives from cashing any checks or spending any of the proceeds of the August Receivables or the Account Receivables, and requiring Defendant to send checks for the August Receivables and the Account Receivables to the Debtors for cashing and deposit with the Escrow Agent, as may be appropriate.

### FIFTH CAUSE OF ACTION: REQUEST FOR AN ACCOUNTING

34. Plaintiffs reallege the allegations set forth in paragraphs 1 through 33 of this Complaint as though fully set forth herein.

35. Section 2202 of Title 28 provides that this Court may grant "further or necessary or proper relief based on a declaratory judgment or decree" against "any adverse party whose rights have been determined by such judgment".

36. Plaintiffs ask that this Court compel ICG to provide this estate with a full accounting of any amounts they have received in order to determine whether or not they are holding any other proceeds of the August Receivables or any Account Receivables.

### SIXTH CAUSE OF ACTION: TURNOVER

37. Plaintiffs reallege the allegations set forth in paragraphs 1 through 36 of this Complaint as though fully set forth herein.

38. Section 542 of the United States Bankruptcy Code provides that any party holding any property of the estate must turn those funds over to the trustee, which in this case is the debtor-in-possession.

39. Plaintiffs seek an order of the Court compelling ICG to turn over the proceeds of the August Receivables and the Account Receivables to the Debtors.

### SEVENTH CAUSE OF ACTION: TURNOVER OF CERTAIN VEHICLES

40. Plaintiffs reallege the allegations set forth in paragraphs 1 through 39 as though fully set forth herein.

41. Section 542 of the United States Bankruptcy Code provides that any party holding any property of the estate must turn that property over to the trustee, which in this case is the debtor-in-possession.

42. Plaintiffs seek an order of the Court compelling ICG to turn over the Estate Vehicles to the Debtors.

### EIGHTH CAUSE OF ACTION: BREACH OF CONTRACT RELATING TO CURE COSTS

43. Plaintiffs reallege the allegations set forth in paragraphs 1 through 42 as though fully set forth herein.

44. The Debtors incurred approximately $799,341.07 in connection with paying the New Cure Costs. ICG is responsible for these New Cure Costs and is in breach of contract. Alternatively, ICG has been unjustly enriched and is obligated to reimburse the Debtors for payment of the New Cure Costs.

45. Plaintiffs seek an order of the Court compelling ICG to pay to the Debtors an amount equal to the New Cure Costs.

**NINTH CAUSE OF ACTION: PAYMENT OF POST-CLOSING VENDOR BILLS**

46. Plaintiffs reallege the allegations set forth in paragraphs 1 through 45 as though fully set forth herein.

47. ICG is obligated to pay all liabilities (pre- and post-petition) of Corban Towers, but such payments have not been made. While Plaintiffs would not expect Corban Towers to pay the prepetition amounts, all cures and administrative expenses of Corban Towers should have been paid. Likewise, ICG is obligated to pay all costs arising under any of the executory contracts after July 23, 2004, that were assigned to ICG. ICG has not been paying all of these costs, and many of the vendors have been contacting the Debtors seeking payment.

48. Plaintiffs seek an order of the Court compelling ICG to pay these amounts.

**TENTH CAUSE OF ACTION: MANAGEMENT AGREEMENT–
TURNOVER OF REQUIRED REPORTS**

49. Plaintiffs reallege the allegations set forth in paragraphs 1 through 48 as though fully set forth herein.

50. In connection with the Final APA, the Debtors and ICG entered into a Management Agreement that essentially provided that the Debtors would permit ICG to operate under the Debtors' various FCC licenses pending approval of ICG's own applications. A copy of the Management Agreement is attached hereto as <u>Exhibit D</u>. Under the terms of the Management Agreement, ICG is required to provide the Debtors with certain information, including but not limited to those reports listed on exhibit A to the Management Agreement (the "<u>Management Agreement Information</u>"). The Debtors need the Management Agreement Information in order to comply with certain FCC rules and regulations.

51. ICG has refused to provide the Management Agreement Information to date. As a result, the Debtors have been unable to comply with FCC requirements and risk FCC penalties.

52. Plaintiffs seek an order of the Court compelling ICG to turn over the Management Agreement Information to the Debtors.

### ELEVENTH CAUSE OF ACTION: MANAGEMENT AGREEMENT–TURNOVER OF ESTATES' MONEY

53. Plaintiffs reallege the allegations set forth in paragraphs 1 through 52 as though fully set forth herein.

54. Under the terms of the Management Agreement, ICG also is required to pay:

> "all actual costs and expenses accruing from and after the Closing in connection with the ongoing operations of the Business, including without limitation, costs and expenses to operate the FCC-Licensed Transmitters and to compensate the Licensee [Debtors] in fulfilling its obligations under the Management Agreement.

Paragraph 4(b) of the Management Agreement.

Debtors have made demand for payment of expenses incurred with the post-closing operation of the business, including but not limited to $133,1860.70 in license expenses that have accrued after July 23, 2004 (the "Management Agreement Funds"). Pursuant to the Management Agreement, ICG is responsible for payment of these Management Agreement Funds.

55. Plaintiffs seek an order of the Court compelling ICG to turn over the Management Agreement Funds to the Debtors.

## TWELFTH CAUSE OF ACTION: 401(K) AGREEMENT

56. Plaintiffs reallege the allegations set forth in paragraphs 1 through 55 as though fully set forth herein.

57. ICG requested that it be listed as a multiple employer on the Debtors' 401(k) Plan established for the benefit of the Debtors' employees. Continuing the same 401(k) Plan would reduce costs to both the Debtors and ICG; ICG would not need to establish a new plan and the Debtors would not need to wind down the existing plan.

58. Shortly after closing the Final APA, ICG began making deposits into the 401(k) Plan. However, ICG has since ceased making deposits, and, the Debtors have reason to believe that ICG no longer intends to serve as an employer under the 401(k) Plan.

59. As a result of ICG's breach of its agreement regarding the 401(k) Plan, the Debtors have incurred unexpected costs in connection with the 401(k) Plan, including increased legal expenses and the employment of an auditor to assist in the winding down of the 401(k) Plan.

60. Plaintiffs seek an order of the Court compelling ICG to pay to the Debtors for all costs and expenses incurred by the Debtors as a result of ICG's breach of the 401(k) Agreement.

## THIRTEENTH CAUSE OF ACTION: TURNOVER OF CONFIDENTIAL INFORMATION

61. Plaintiffs reallege the allegations set forth in paragraphs 1 through 60 as though fully set forth herein.

62. Under the terms of the Final APA, ICG is required to turnover certain confidential information ("Confidential Information") to the Debtors, including files of any

executory agreements that were not assigned to ICG and any information contained on the computer hard drive commonly referred to as the "DC Corban Drive."

63. Plaintiffs seek an order of the Court compelling ICG to turn over the Confidential Information to the Debtors.

## FOURTEENTH CAUSE OF ACTION: ATTORNEYS' FEES AND EXPENSES

64. Plaintiffs reallege the allegations set forth in paragraphs 1 through 63 as though fully set forth herein.

65. Plaintiffs are entitled to their reasonable and necessary costs and expenses, including attorneys' fees in bringing this cause of action under Tex. Civ. Prac. & Rem. Code Sections 37.009 and 38.001 (West 2004).

WHEREFORE, Plaintiffs pray that:

A. The Court declare the August Receivables and the Estate Vehicles to be owned by the Plaintiffs as one of the "Retained Assets" under the Final APA;

B. The Court compel turnover of the proceeds of the Account Receivables and the August Receivables;

C. The Court grant Plaintiffs their damages for conversion of estate assets and for consequential damages associated with ICG's breach of the Letter Agreement, the Management Agreement, the 401(K) Agreement, and the Final APA;

D. The Court enter a temporary and preliminary injunction enjoining ICG, its respective agents and representatives from either cashing or spending the

proceeds of the Account Receivables or the August Receivables until such time as this Court can rule on who owns the August Receivables;

E. The Court enter a permanent injunction enjoining ICG, its respective agents and representatives from either cashing or spending the proceeds of the Account Receivables or the August Receivables;

F. The Court compel turnover of the Estate Vehicles and the Confidential Information to the Debtors;

G. The Court compel ICG to provide Plaintiffs with an accounting of the Account Receivables and the August Receivables;

H. The Court grant Plaintiffs their reasonable costs and expenses, including attorneys' fees in this action; and

I. The Court grant Plaintiffs such other and further relief as is just.

Respectfully submitted this 19th day of October 2004:

| BAKER BOTTS L.L.P. | BAKER & M<sup>c</sup>KENZIE LLP |
|---|---|
| *[signature]* | *[signature] By Permission Luckey McDowell* |
| Judith W. Ross | David W. Parham |
| State Bar No. 21010670 | State Bar No. 15459500 |
| C. Luckey McDowell | Laurie D. Babich |
| State Bar No. 24034565 | State Bar No. 00796150 |
| 2001 Ross Avenue | 2300 Trammell Crow Center |
| Dallas, Texas 75201 | 2001 Ross Avenue |
| Telephone: 214.953.6500 | Dallas, Texas 75201 |
| Facsimile: 214.953.6503 | Telephone: 214.978.3000 |
| Email: *judith.ross@bakerbotts.com* | Facsimile: 214.978.3099 |
| *luckey.mcdowell@bakerbotts.com* | Email: *david.w.parham@bakernet.com* |
| | *laurie.d.babich@bakernet.com* |
| **COUNSEL TO DEBTORS** | **ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |