Judith W. Ross
State Bar No. 21010670
C. Luckey McDowell
State Bar No. 24034565
Rachel J. Doyle
State Bar No. 06096300
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
Telephone: 214.953.6500
Facsimile: 214.953.6503
Email: *judith.ross@bakerbotts.com*
       *luckey.mcdowell@bakerbotts.com*
       *rachel.doyle@bakerbotts.com*

**COUNSEL TO DEBTORS-IN-POSSESSION**

David W. Parham
State Bar No. 15459500
Laurie Dahl Babich
State Bar No. 00796150
BAKER & MCKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201
Telephone: 214.978.3000
Facsimile: 214.978.3099

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CORBAN COMMUNICATIONS, INC. | § | Case No. 04-32972-SAF-11 |
| and COLORADO 4-19 NETWORK, INC., | § | |
| | § | Chapter 11 |
| Debtors. | § | (Jointly Administered) |
| | § | |
| CORBAN COMMUNICATIONS, INC., | § | |
| COLORADO 4-19 NETWORK, INC., and | § | |
| THE OFFICIAL COMMITTEE OF UNSECURED | § | |
| CREDITORS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Adversary No. 04-03543 |
| | § | |
| INTERNATIONAL COMMUNICATIONS | § | |
| GROUP, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ........................................................................................ 2

II.   FACTUAL BACKGROUND ...................................................................................... 3

III.   ARGUMENT AND AUTHORITIES ......................................................................... 18

   A.   Summary Judgment Standard. .......................................................................... 18

   B.   ICG's Agreement to Purchase the Assets of Debtors "As Is" Precludes ICG From
        Proving that Debtors' Conduct Caused it Any Harm. ...................................... 18

   C.   By the Plain Language of the Final APA and Its Schedules, the Alpha Lease and the
        Transmission Equipment Were Not Assets to be Purchased by ICG. .............. 21

   D.   ICG Could Not Have Relied Upon Any Alleged Representations that Debtors Were
        Selling the Alpha Lease. .................................................................................. 23

   E.   ICG Released or Waived Any Claims It Had Against Debtors for Breach of
        Representations. ................................................................................................ 25

   F.   ICG has Produced No Evidence that Debtors Made Representations that the
        Alpha Lease and the Transmission Equipment Were Assets Being Sold to ICG
        Under the Final APA, and Summary Judgment Should be Granted Pursuant to
        Fed. R. Civ. P. 56(e). ...................................................................................... 26

IV.   CONCLUSION........................................................................................................ 27

# TABLE OF AUTHORITIES

## CASES

*Baton Rouge Oil and Chemical Workers Union v. ExxonMobil Corporation*,
      289 F.3d 373 (5th Cir. 2002) ..............................................................................................23

*Celotex Corp. v. Catrett*,
      477 U.S. 317, 106 S. Ct. 2548 (1986).................................................................................18

*Friedrich v. Local No. 780, IUE-AFL-CIO-CLC*,
      515 F.2d 225 (5th Cir. 1975) ..............................................................................................23

*Koral Industries, Inc. v. Security-Connecticut Life Ins. Co.*,
      788 S.W.2d 136 (Tex. App- Dallas, 1990 writ denied) ......................................................24

*Prudential Ins. Co. of America v. Jefferson Associates, LTD.*,
      896 S.W.2d 156 (Tex. 1995)..........................................................................................18, 19

*Wallace v. Texas Tech University*,
      80 F.3d 1042 (5th Cir. 1996), *citing Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th
      Cir. 1994) .............................................................................................................................18

*Western Oil Fields, Inc. v. Pennzoil United, Inc.*,
      421 F. 2d 387 (5th Cir. 1970) .............................................................................................23

## STATUTES

Fed. R. Civ. P. 56 (e) ...........................................................................................1, 3, 18, 26, 27

Fed. R. Evid. 201(b).................................................................................4, 5, 6, 7, 9, 10, 11, 12

11 U.S.C. § 365(d)(4) ....................................................................................................9, 10

Plaintiffs, Corban Communications, Inc. (individually, "Corban") and Colorado 4-19 Network, Inc. (individually, "Colorado 4-19"), Debtors-in-Possession, (both Corban and Colorado being collectively referred to as the "Debtors") and the Official Committee of Unsecured Creditors (individually, "Committee") (the Debtors and Committee being collectively referred to as the "Plaintiffs") file this Motion for Partial Summary Judgment regarding the claims made by Defendant and Counter-Plaintiff, International Communications Group Inc. ("ICG" or "Counter-Plaintiff) concerning a lease with Alpha Communications Sites, Inc. ("Alpha") related to the Ensign Peak, Utah communications tower (the "Alpha Lease"). Plaintiffs will show that, as a matter of law, ICG's claims are not valid, there are no genuine issues of material fact and these claims relating to the Alpha Lease should be dismissed by summary judgment.

## I.

## SUMMARY OF ARGUMENT

ICG claims that Debtors breached their contract with ICG because Debtors failed to assume the Alpha Lease before the expiration of the deadline to assume or reject the lease. The Alpha Lease covers a transmission tower that ICG considers to be highly significant in the operation of the Corban network. ICG incorrectly claims that Debtors breached the Final APA by representing to ICG that Debtors were selling the Alpha Lease and Transmission Equipment, and ICG has been damaged by the failure to sell this lease and equipment. Plaintiff's are, however, entitled to summary judgment for the following reasons:

First, Debtors made no representations or warranties in the Final APA; the assets were sold "as is."

Second, the plain language of the Final APA states that Debtors were selling only those contracts or leases in effect on the Sale Date and which were listed on an attached schedule. The Alpha Lease was not in effect on the Sale Date and it was not listed on the schedule.

Third, ICG was aware that the Alpha Lease was rejected prior to the execution of the Final APA and neither ICG nor its counsel, objected when it was announced in open court that the Alpha Lease was terminated, and they did not object when an order was entered in September, 2004, affirming the rejection and termination of the lease.

Fourth, ICG has waived and/or released any claims it had against Debtors.

Moreover, ICG has produced no evidence that Debtors made representations that the Alpha Lease and the Transmission Equipment were assets being sold to ICG under the Final APA. There has been adequate time for discovery and under Fed. R. Civ. P. 56 (e), and since ICG has no evidence to support essential elements of its claim, summary judgment should be entered against ICG's claim.

ICG cannot establish that any representations made by Debtors caused it any harm.

Accordingly, there is no genuine issue of material fact as to the essential elements for ICG's claims related to the Alpha Lease, and Debtors are entitled to summary judgment as a matter of law.

## II.

## FACTUAL BACKGROUND

1.  Corban was engaged in the microwave wireless communications business and was the owner or lessee of certain real property. See Asset Purchase Agreement (without the schedules which are voluminous), dated July 21, 2004 (referred to as "Final APA"), Paragraph Recitals A, located in the Appendix at Tab 1, filed with

the court on July 14 and July 22, 2004.  Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).  See also, excerpts from deposition testimony of Bob Esty ("Esty Depo"), pp. 137-138, 142, located in the Appendix at Tab 15.

2.    Colorado 4-19 was engaged in the fiber optic cable business and was the owner or lessee of certain real property.  See Final APA, Recitals A, located in the Appendix at Tab 1.

3.    ICG is a Nevada corporation engaged in the telecommunications business, through Corban Networks providing communications transport, primarily providing access into smaller markets for other communications companies.  See Excerpts from Deposition of Jay Bilden ("Bilden Depo"), p. 7, located in the Appendix at Tab 17.

4.    ICG and Esty Management, LLC were represented by Monica S. Blacker and Matthew Hutchins, Sr, of Andrews Kurth LLP, and on March 19, 2004, they filed a Notice of Appearance and Request for Service of Papers in this Bankruptcy action, supplying the court with their valid e-mail addresses.  See Notice of Appearance and Request for Service of Papers located in the Appendix at Tab 2. Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).  See also Excerpts from Transcript of Proceedings on July 15, 2004, p. 3, located in the Appendix at Tab 18.

5.    Debtors request the Court to take judicial notice pursuant to Fed. R. Evid. 201(b), of the fact that electronic copies of all motions and other pleadings in this

bankruptcy case are made available to all counsel who have made an appearance on the record and provided e-mail addresses.

6.   ICG negotiated with Debtors for the purchase of substantially all of the assets of Debtors and an Asset Purchase Agreement was filed with the Court on May 25, 2004 ( the "Originally Filed APA"). The Court orally approved the Originally Filed APA. See Originally Filed APA located in the Appendix at Tab 3. Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b). See also Esty Depo, p. 139, located in the Appendix at Tab 15.

7.   Between May 26, 2004 and the date the Originally Filed APA ultimately was scheduled to close, ICG demanded changes to significant and material portions of the Originally Filed APA and threatened litigation with all of the parties in order to obtain those material concessions. See Affidavit of Henry A. Thomas ("Thomas Affidavit"), Paragraph 6, located in the Appendix at Tab 19.

8.   ICG made a $450,000 non-refundable deposit in order to become a qualified bidder for the assets of Debtors. See Thomas Affidavit, Paragraph 4, located in the Appendix at Tab 19.

9.   ICG had attempted to secure funding for the transaction from Beal Bank, but Bob Esty, President of ICG testified he was told on the Friday before the Monday auction that the loan would not be made to ICG. Nevertheless, ICG did not inform the court that it did not have financing for the transaction, as Bob Esty testified, "because I had half a million dollars at risk, and I was praying as I've never prayed before that I would come in No. 2." See Esty Depo at pp. 30-32,

177- 179, located in the Appendix at Tab 15.  In response to the statement that he came in No. 1 instead, Mr. Esty replied, "the dog caught up with the bus."  *Id.*

10.  Notwithstanding significant concessions made by the Debtors in an effort to complete the transaction with ICG, because it had not obtained financing, ICG wholly failed the close on the Originally Filed APA, which had been scheduled to close on or about June 23, 2004.  See Esty Depo, pp. 51, 172-173 located in the Appendix at Tab 15; see Thomas Affidavit, Paragraph 7, located in the Appendix at Tab 19.

11.  Under the Originally Filed APA, ICG was to purchase most of the assets of the Debtors and purchase the stock of Corban Towers, Inc. ("Corban Towers"), a subsidiary of Corban Communications, Inc.  See Originally Filed APA located in the Appendix at Tab 3.

12.  One of the assets that had been owned by Debtors was the lease with Alpha Communication Sites, Inc. ("Alpha") related to the Ensign Peak, Utah tower (the "Alpha Lease").  This lease was listed on Schedule 2.1(f)(i) of the Originally Filed APA, as one of the assets ICG intended to purchase.  See Originally Filed APA as well as Schedule 2.1(f)(i) Corban Towers, Inc. (Other Agreements) at p. 11/11, located in the Appendix at Tab 4.  See Proof of Claim (and attached lease) filed by Alpha Communications Sites, Inc. on October 18, 2004, located in the Appendix at Tab 5.  Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).

13.  According to ICG, the Ensign Peak tower is a key transmission location for ICG in its business as a communications provider with nationwide data and voice

network.   See ICG's Answer to First Amended Complaint for Declaratory Judgment, for an Accounting, For Damages and for Turnover of Property and International Communications Group Inc.'s Counterclaims ("ICG's Counterclaim"), Paragraph 85.   Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).

14.   ICG also claims that it was to purchase certain transmission equipment, including radio gear, located on the Ensign Peak tower (the "Transmission Equipment"). ICG further claims that the Transmission Equipment serves vital national telecommunications needs and interests. The telecommunications traffic flowing through the Transmission Equipment not only serves thousands of residential and commercial telephone users, but also provides 911 service for police, fire department and other emergency services in Northern Utah.   See ICG's Counterclaim, Paragraph 86.

15.   Debtors had informed ICG that the tower and Transmission Equipment at Ensign Peak were critical to the operations of the Corban network.  See Bilden Depo at pp. 33-35, located in the Appendix at Tab 17.

16.   Upon ICG's failure to close under the Originally Filed APA, the Court reopened the bidding process and rescheduled sales hearings during the week of July 19, 2004. ("Rescheduled Sale Hearings").   See Thomas Affidavit, Paragraph 10, located in the Appendix at Tab 19.

17.   FTI Consulting, consultant to Debtors in connection with the sale of Debtors' assets, transmitted to all potential bidders a prototype of the list of assets to be purchased.  However, bidders for the assets were responsible for preparing the

schedules of the assets they wished to purchase. See Thomas Affidavit, Paragraph 13, located in the Appendix at Tab 19.

18.     Ray Powers and Bob Esty were responsible for due diligence on behalf of ICG. See Excerpts from deposition of Ray Powers ("Powers Depo") at p. 12, located in the Appendix at Tab 16.

19.     Ray Powers submitted the list of assets ICG wished to purchase and to be attached as a schedule to the Final APA.  See Esty Depo, pp. 112, 250, located in the Appendix at Tab 15.  See Powers Depo at pp. 15-16, 20-21, located in the Appendix at Tab 16.

20.     The list of real property leases to be purchased/assumed by ICG was attached to the Final APA as Schedule 2.1(g)(i) but the individual sheets of the list were erroneously labeled Schedule 2.1(f)(i).  See Thomas Affidavit, Paragraph 14, located in the Appendix at Tab 19 and Schedule 2.1(g)(i), part of Esty deposition Exhibit 34, located in the Appendix at Tab 6.

21.     The list of real property leases to be purchased/assumed by ICG which was attached to the Final APA, unlike the list attached to the Originally Filed APA, did not include the Alpha Lease at Ensign Peak, Utah.  See Powers Depo at pp. 77-78, located in the Appendix at Tab 16.  See also, Esty Depo at pp. 191-193, located in the Appendix at Tab 15, referencing exhibits 33 and 34, schedules to Originally filed APA and Final APA, located in the Appendix at Tabs 4 and 6.

22.     Ultimately, the Court approved the sale to ICG under certain defined terms at the Rescheduled Sale Hearings. See Thomas Affidavit, Paragraph 11, located in the Appendix at Tab 19.

23. After the Court's approval of the sale to ICG, ICG demanded that the Debtors capitulate to their demands that certain material provisions of the Final APA approved by this Court be renegotiated. Debtors refused to capitulate to these demands, and the transaction closed on July 26, 2004. See Thomas Affidavit, Paragraph 12, located in the Appendix at Tab 19. See Esty Depo at p. 203, located in the Appendix at Tab 15. See also Amended Order Authorizing Debtors to Sell to Corban Acquisition Corporation and 360networks (USA) Inc. Certain Properties of Their Estates Free and Clear of Liens, Claims and Encumbrances, located in the Appendix at Tab 7. Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).

24. Under 11 U.S.C. § 365, a debtor has 60 days to assume or reject an executory contract relating to non-residential real property. If this is not done within the 60 day time period, the contract is rejected as a matter of law.

25. On March 25, 2004, Debtors filed a motion to extend the 60-day period to assume or reject the Alpha Lease (among other leases of non-residential real property), with a hearing set for April 29, 2004. See Debtors' Motion to Extend Time to Assume or Reject Leases of Non-Residential Real Property, located in the Appendix at Tab 8. Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).

26. Alpha filed an objection to Debtors' motion because the annual payment, due on May 1, 2004, in the amount of $10,925.00 had not been made, and Alpha had not received assurances that the payment would be made when due. See Alpha Communication Sites, Inc.'s Objection to Debtors' Motion to Extend Time to

Assume or Reject Leases of Non-Residential Real Property, located in the
Appendix at Tab 9. Plaintiffs request that the Court take judicial notice of these
court papers, pursuant to Fed. R. Evid. 201(b).

27. Despite Alpha's objections, an order was issued on April 30, 2004, to extend the
time period by 60 days for all non-residential real property leases except the lease
with Alpha. The time period for assuming or rejecting the Alpha Lease was
extended by only 30 days. See Order Granting Debtors' Motion to Extend Time
to Assume or Reject Leases of Nonresidential Real Property, located in the
Appendix at Tab 10. Plaintiffs request that the Court take judicial notice of these
court papers, pursuant to Fed. R. Evid. 201(b).

28. After ICG failed in June to close the Originally Filed APA, on June 29, 2004
Debtors filed another motion to extend the time period to assume or reject leases
on non-residential real property. See Debtors' Motion to Extend Time to Assume
or Reject Lease of Nonresidential Real Property filed June 29, 2004, located in
the Appendix at Tab 11. Plaintiffs request that the Court take judicial notice of
these court papers, pursuant to Fed. R. Evid. 201(b).

29. Again, Alpha filed an objection with this court, pointing out that the Debtors'
previous extension as to Alpha was only thirty days and Debtor had until June 11,
2004 to assume or reject Alpha's lease. Alpha's objection pointed out that
because the lease was not assumed prior to June 11, 2004, pursuant to 11 U.S.C.
§ 365(d)(4), the Alpha lease was deemed to be rejected and the Debtors were
required to immediately surrender the non-residential real property to Alpha. See
Alpha Communications Sites, Inc.'s Objection to Debtors' June 29, 2004, Motion

to Extend Time To Assume or Reject Leases of Non-Residential Real Property, located in the Appendix at Tab 12. Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).

30.    At a hearing in open court on July 15, 2004, Steve Christensen, attorney for Alpha announced that the lease between Corban and Alpha had been terminated. Attorneys for Corban agreed with that statement, stating "Your honor, we can't dispute it. …therefore, any order extending the dates could not apply to those since their contract is already terminated." See Excerpts from Transcript of Hearing on July 15, 2004, p. 11 located in the Appendix at Tab 18.

31.    Counsel for ICG, Monica Blacker, as well as ICG's president, Bob Esty were present in the courtroom when these statements were made. Neither Ms. Blacker nor Mr. Esty responded to the statements made by Alpha or Debtors. See Excerpts from Transcript of Hearing on July 15, 2004, pp. 5, 11-12 located in the Appendix at Tab 18. See Affidavit of Judith Ross ("Ross Affidavit") at Paragraphs 6 and 8, located in the Appendix at Tab 20. See Thomas Affidavit at Paragraphs 17 and 18, located in the Appendix at Tab 19.

32.    The Court asked counsel for Alpha to submit an Order. See Excerpts from Transcript of Hearing on July 15, 2004, p. 12, located in the Appendix at Tab 18.

33.    Counsel for Alpha submitted an order declaring that the Alpha Lease was rejected and terminated, and the order was entered September 1. As the lease had already been rejected by operation of law, Debtors did not oppose the entry of the order. ICG did not oppose the entry of the order. See Ross Affidavit, Paragraph 9, located in the Appendix at Tab 20 and Order Rejecting and Terminating Lease

with Alpha Communication Sites, Inc. for Non Residential Real Property, located in the Appendix at Tab 13. Plaintiffs request that the Court take judicial notice of these court papers, pursuant to Fed. R. Evid. 201(b).

34.    Paragraph 2.1(g) of the Final APA states that the following items are Purchased Assets:

> (g)  Assumed Contracts.  The following Contracts and all rights of any kind relating thereto other than the Excluded Contractual Rights (the "Assumed Contracts"):
>
> > (i)    The real property leases for leased premises in effect as of the Sale Date to which any Seller is a party or by which any Seller is bound and which is listed on Schedule 2.1(g)(i); ....

35.    The Sale Date, defined in the Final APA as the date the Sale Order is entered by the Bankruptcy Court, was July 26, 2004.

36.    The Alpha Lease was not in effect as of the Sale Date; it had terminated June 11, 2004.  See Order Rejecting and Terminating Lease with Alpha Communication Sites, Inc. for Non Residential Real Property, located in the Appendix at Tab 13.

37.    Counsel for Debtors was contacted by another bidder, ATN, concerning the rejected Alpha Lease., but ICG did not contact counsel or debtors to inquire about the rejected lease  See Ross Affidavit, Paragraphs 10 and 11, located in the Appendix at Tab 20 and Thomas Affidavit, Paragraph 19, located in the Appendix at Tab 19.

38.    The Final APA included as Schedule 2.1(g)(i) (erroneously labeled 2.1(f)(i)) a list of Real Property Leases to be assumed under the Final APA.  The Alpha Lease is not listed on the schedule.  See Excerpts from Deposition of Ray Powers, pp. 77-

78, located in the Appendix at Tab 16.  See Esty Depo at p. 124, located in the Appendix at Tab 15.

39.    ICG admits that it did not conduct any due diligence to determine the existence or validity of the Alpha Lease.  Mr. Esty stated that "we took the exhibits as prepared by FTI as agent of the debtor at face value."  See Esty Depo at p. 122, located in the Appendix at Tab 15.

40.    Ray Powers admits that he only assumed the lease was a valid lease to be transferred because the Ensign Peak tower appeared on a tower list.  In describing his due diligence efforts, Powers did not describe anything he did to verify that the lease was in effect at the time of the closing of the Final APA.  See Powers Depo, pp. 12-17, 20-25, 35-40, located in the Appendix at Tab 16.

41.    In order to satisfy itself that the network was intact prior to closing, ICG only talked to members of Corban's engineering department.  ICG admits that it did not check court records to determine if the Alpha Lease had been assumed or rejected and admits that Debtors could not hide the court filings.  See Esty Depo at pp. 121, 262-265 located in the Appendix at Tab 15.

42.    ICG admits that it did not conduct any due diligence with respect to expired deadlines on assets to be purchased between the date that it won the first auction for the assets of debtors, without having had financing in place, and the date it submitted its bid for the second auction.  See Esty Depo pp. 103-104, located in the Appendix at Tab 15.  Mr. Esty stated that he did not make inquiry before closing the second time to find out whether or not time periods had expired on leases and contracts "because that issue was not my greatest concern."  *Id.*

43.    ICG claims it had no reason to find out the dates on which leases should be assigned or rejected, because ICG was not a party to the leases.  See Esty Depo at p. 122, located in the Appendix at Tab 15.

44.    Jay Bilden, the contact person with Debtors, stated that he did not have discussions with anyone at ICG about any of the contracts from the time the first APA did not close and the time the Final APA did close.  See Bilden Depo, pp. 20-21, located in the Appendix at Tab 17.

45.    ICG did not prepare new schedules of assumption lists to submit to FTI for inclusion in the Final APA.  See Powers Depo, p. 78, located in the Appendix at Tab 16.

46.    ICG admits that FTI encouraged ICG to check the schedules for accuracy.  See Esty Depo p. 98, located in the Appendix at Tab 15.

47.    ICG admits that FTI never indicated to ICG that it would review and revise the schedules on ICG's behalf to make sure they were right.  See Esty Depo at p. 177, located in the Appendix at Tab 15.

48.    Prior to closing, Bob Esty was the person responsible for reviewing the schedules attached to the Final APA, and he went through all the schedules.  See Esty Depo at pp. 96-97, 252-253, located in the Appendix at Tab 15.

49.    ICG admits that the Final APA did not make any representation that all leases were still in effect.  See Esty Depo, pp. 122-123, located in the Appendix at Tab 15.

50.    Debtors made no representations or warranties with respect to the Alpha Lease or Transmission Equipment.  Specifically, paragraph 5.4 of the Final APA states:

5.4 No Implied or Other Representations or Warranties.
EXCEPT AS OTHERWISE EXPRESSLY SET FORTH
HEREIN, IT IS THE EXPLICIT INTENT OF EACH
PARTY HERETO THAT SELLERS AND ANY OF
THEIR RESPECTIVE AFFILIATES ARE NOT MAKING
ANY REPRESENTATION OR WARRANTY
WHATSOEVER, EXPRESS OR IMPLIED, BEYOND
THOSE EXPRESSLY GIVEN IN THIS AGREEMENT,
INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED
WARRANTY OR REPRESENTATION AS TO
CONDITION, MERCHANTABILITY, SUITABILITY
OR FITNESS FOR A PARTICULAR PURPOSE AS TO
ANY OF THE ASSETS, AND IT IS UNDERSTOOD
THAT EXCEPT AS EXPRESSLY STATED IN THIS
AGREEMENT, BUYER TAKES ALL OF SUCH
PROPERTIES AND ASSETS ON AN "AS IS" AND
"WHERE IS" BASIS.

See Final APA, Paragraph 5.4, located in the Appendix at Tab 1.

51.     Furthermore, Bob Esty acknowledged that he was aware that under the asset

purchase agreement all representations and warranties fall away at closing. See

Esty Depo at p. 260, located in the Appendix at Tab 15.

52.     ICG acknowledged that it was accepting the Purchased Assets in their present

condition with no warranties from Seller. Specifically, Paragraph 6.8 of the Final

APA states:

6.8 Buyer's Investigation. Buyer represents that it is a
sophisticated entity that was advised by knowledgeable
counsel and financial advisors and hereby acknowledges
that it has conducted an investigation of the Purchased
Assets. Notwithstanding anything in this Agreement to the
contrary, Buyer acknowledges that it is accepting the
Purchased Assets in their present condition and locations
and with their present operating capabilities. Buyer
acknowledges that Sellers make no warranty, express or
implied, as to the condition of the Purchased Assets except
as expressly set forth in this Agreement. Buyer has not
relied upon, and Sellers shall not be liable for or bound in
any manner by, any express or implied verbal or written
information, warranties, guarantees, promises, statements,

inducements, representations or opinions pertaining to the Business, the Purchased Assets, the Assumed Contracts or the Assumed Liabilities, except as may be contained in this Agreement.  Buyer has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition. Buyer is relying solely upon its own inspection of the Purchased Assets, and Buyer shall accept all of the same in their as is, where is, condition. Buyer acknowledges that the representations and warranties of Sellers contained in this Agreement constitute the sole and exclusive representations and warranties of Sellers to Buyer in connection with this Agreement and the Contemplated Transactions, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a claim against any Seller.

See Final APA, Paragraph 6.8, located in the Appendix at Tab 1.

53.    The Alpha Lease was made available for ICG's review prior to the Sale Date.  See Bilden Depo at pp. 15, 21, located in the Appendix at Tab 17.  However, ICG did not review all of the contracts.  See Powers Depo at pp. 22-23, located in Appendix at Tab 16.

54.    Despite the stated importance of the Ensign Peak tower and Transmission Equipment, Ray Powers, who was conducting due diligence for ICG, did not review the Alpha Lease, nor did he review the schedules actually attached to the Originally Filed APA or the Final APA.  See Powers Depo at pp. 37, 24, 25, located in the Appendix at Tab 16.

55.    Between the date of the failed closure of the Originally Filed APA and the execution of the Final APA, ICG did not ask to review any additional documentation or contracts.  See Bilden Depo at p. 20, located in the Appendix at Tab 17.  See Powers Depo at pp. 72, 78, located in the Appendix at Tab 16.

56.    The Final APA included lists of assets to be excluded, which included "(c) Retained Contracts - all rights of sellers under this Agreement and any Contract that is not an Assumed Contract." See Final APA, Paragraph 2.2(c), located in the Appendix at Tab 1.

57.    In connection with the Final APA, ICG signed a Release of any and all claims against the Debtors and other entities. See Release dated July 23, 2004, located in the Appendix at Tab 14.

58.    Bob Esty executed the release and he acknowledged that by executing the release ICG was releasing all claims against the Released parties save and except the enforcement of the asset purchase agreement itself. See Esty Depo, p. 233, located in the Appendix at Tab15.

59.    ICG admitted that leading up to the sale, Debtors did not fail to provide any information that was requested by ICG. See Esty Depo at p. 240, located in the Appendix at Tab 15.

60.    Bob Esty could not identify any information prior to closing the Final APA that was withheld from ICG or misrepresented to ICG; rather Mr. Esty could only identify certain accounting software and information that was allegedly withheld after the sale "that would hinder us from ever being successful." See Esty Depo at pp. 239-240, located in the Appendix at Tab 15.

61.    Mr. Powers stated that he did not believe that FTI or Jay Bilden had lied to him. See Powers Depo at pp. 50-51, located in the Appendix at Tab 16.

## III.

## ARGUMENT AND AUTHORITIES

### A.  Summary Judgment Standard.

After adequate time for discovery, the court may grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S. Ct. 2548, 2552 (1986); *see* Fed. R. Civ. P. 56(c).  The movant "need not negate the elements of the nonmovant's case."  *Wallace v. Texas Tech University,* 80 F.3d 1042, 1047 (5th Cir. 1996), *citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

The Final APA provides in Paragraph 11.7 that the Agreement shall be governed by and construed under Texas law.  See. Final APA, located in the Appendix at Tab 1.

### B.  ICG's Agreement to Purchase the Assets of Debtors "As Is" Precludes ICG From Proving that Debtors' Conduct Caused it Any Harm.

In order to recover on its breach of contract claim with respect to the Alpha Lease, ICG must prove that Debtors caused ICG damages.  Unless this evidence satisfies the requirement of actual causation in fact, ICG is not entitled to recover on its claim.  *Prudential Ins. Co. of America v. Jefferson Associates, LTD.,* 896 S.W.2d 156, 161 (Tex. 1995).  In this case, the buyer of an office building purchased the building under a contract with an "AS IS" clause in which the buyer acknowledged that he was taking the property with the understanding that there were no express or implied warranties concerning the property, and that the buyer was not relying upon any representation, statement or assertion with respect to the property but was relying upon its own examination of the property.  Later it was discovered that the building contained asbestos, and the buyer sought damages from the seller.  The Supreme Court held that the buyer's

agreement to purchase the building "as is" precluded him from proving that the seller's conduct

caused him any harm. "By agreeing to purchase something 'as is', a buyer agrees to make his

own appraisal of the bargain and to accept the risk that he may be wrong." *Id.* In *Prudential*, as

in the instant case, the seller gave no assurances, express or implied, concerning the value or

condition of the thing sold. The buyer contractually acknowledged that he was not relying upon

any representation with respect to the property and was instead relying upon his own inspection

of the property. Similarly, in Paragraph 6.8 of the Final APA, ICG contractually acknowledged

that it was relying upon its own inspection of the assets to be purchased. Moreover, Bob Esty

acknowledged that the Final APA did not make any representations that all leases were valid and

in effect. Esty Depo, pp. 122-123.

    The Texas Supreme Court held that a valid "as is" agreement prevents a buyer from

holding a seller liable if the thing sold turns out to be worth less than the price paid because it is

impossible for the buyer's injury on account of this disparity to have been caused by the seller.

*Id.* "The sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer

himself. He has agreed to take the full risk of determining the value of the purchase." *Id.* In the

instant case, the record is clear that ICG conducted very little, if any, due diligence with respect

to the contracts and/or leases it claims it intended to purchase. Ray Powers and Bob Esty were

the persons responsible for due diligence on ICG's behalf. (Powers Depo, p. 12) Mr. Esty stated

that "we took the exhibits as prepared by FTI as agent of the debtor at face value." See Esty

Depo at p. 122. ICG did not review all the contracts and leases and did not check court records

to determine if the Alpha Lease had been assumed or rejected. See Esty Depo at pp. 103-104,

121, 262-265. ICG claims that it had no reason to find out the dates on which leases should be

assigned or rejected because ICG was not a party to the leases. See Esty Depo at p. 122. This

argument is nonsensical since ICG was preparing to purchase the leases and should determine for itself if the leases had been assumed or rejected; such a determination could impact the bid price for the assets. Between the time the Originally Filed APA was executed and the Final APA was executed, ICG did not prepare new schedules or contact Debtors about any contracts or leases. See Bilden Depo pp. 20-21 and Powers Depo, p. 78. See also Thomas Affidavit at Paragraph 19. It was during this time period that the Alpha lease was rejected by operation of law. ICG was simply negligent in its due diligence duties and claims that it did not discover that the Alpha Lease was no longer in existence. ICG claims that Debtors knew the lease was rejected and did not inform ICG. However, as the record shows and is discussed below, ICG had actual as well as constructive knowledge that the Alpha Lease was terminated and rejected prior to the execution of Final APA. Other bidders for the assets of Debtors reviewed court records and determined that the Alpha Lease had been rejected. See Ross Affidavit, Paragraph 10.

The Court did not suggest that a buyer is forever bound by an agreement to purchase something "as is" if he was induced to make the purchase because of a fraudulent representation or concealment of information by the seller. *Id.* at 162. In order to take advantage of this exception to the enforceability of an "as is" clause, ICG must come forth with evidence that the Debtors fraudulently misrepresented to ICG that the Alpha Lease was a valid contract that was to be sold to ICG or that Debtors actively prevented ICG from learning that the Alpha Lease had been rejected.[1] ICG cannot produce any such evidence. In fact, the evidence is to the contrary.

Because of filing its Notice of Appearance in this Bankruptcy action, ICG's counsel received Alpha's objection to the second request for extension of time to assume or reject the

---

[1] In its counterclaims for breach of contract, ICG has not pleaded fraudulent inducement. ICG has pleaded fraudulent inducement only as an affirmative defense to Debtors' claims against ICG.

lease, in which Alpha asserted that the lease was terminated on June 11, 2004. Furthermore, ICG and its counsel were present in the courtroom on July 15, 2004 (before the Final APA was closed) when counsel for the landlord of the Alpha Lease stated that the contract had been terminated and rejected, and Debtors counsel did not dispute this statement. The Court asked Alpha's counsel to prepare an order to that effect. ICG voiced no objection. ICG had constructive and actual notice that the Alpha Lease was terminated and rejected prior to the closing of the Final APA. ICG cannot have relied upon any alleged representations from Debtors that the Alpha Lease was to be sold to ICG under the Final APA.

Furthermore, when questioned about facts supporting its claim that ICG was fraudulently induced to enter into the Final APA, neither Esty nor Powers could state any facts concerning misrepresentations or information withheld from ICG prior to the execution of the Final APA. Esty admitted that leading up the sale, Debtors did not fail to provide any information that was requested by ICG. Esty Depo at p. 240. When pressed, Mr. Esty could not identify any information prior to closing on the Final APA that was withheld from ICG or misrepresented to ICG. Instead, he could only identify certain accounting information and software that was allegedly withheld after the sale "that would hinder us from ever being successful. Esty Depo at pp. 239-240. At most, Mr. Powers stated that the Ensign Peak tower was on a list of assets and he assumed that it was an asset to be conveyed. Powers Depo at pp. 35-40. Mr. Powers further stated that he did not believe that FTI or Jay Bilden had lied to him. Powers Depo at 50-51. Simply put, there is no evidence that ICG was fraudulently induced to enter into the Final APA.

**C.      By the Plain Language of the Final APA and Its Schedules, the Alpha Lease and the Transmission Equipment Were Not Assets to be Purchased by ICG.**

Paragraph 2.1(g) of the Final APA describes the items that are to be purchased by ICG. The contracts to be assumed include

>        (i)      The real property leases for leased premises **in effect as of
> the Sale Date** to which any Seller is a party or by which any Seller is
> bound **and which is listed** on Schedule 2.1(g)(i);  (emphasis added)

The "Sale Date" was defined as the date the Sale Order was entered by the Bankruptcy

Court, July 26, 2004.  The Alpha Lease was no longer in effect as of the Sale Date, and ICG was

aware of this fact.  At a hearing in open court on July 15, 2004, it was announced that "the Alpha

Communication lease to Corban has been terminated."  Because Debtors did not assume the

Alpha Lease within the required time period, the lease was rejected as a matter of law.  ICG,

through Bob Esty, its President, and ICG's counsel, Monica Blacker were present in the

courtroom when this announcement was made.  Thus, the Alpha Lease could not be an item for

sale under the Final APA because it was not in effect on the Sale Date, and ICG was aware of

this fact.

Furthermore, the Alpha Lease is not listed on Schedule 2.1(g)(i) (erroneously labeled

2.1(f)(i)).  The Final APA does not make provision for the sale or assumption of any contracts

which are not listed on the Schedule.  Mr. Esty admits that he was the person responsible for

reviewing the schedules attached to the APA and that he reviewed the schedules but could have

missed a few items.  Esty Depo at pp. 96-97, 252-253.  As the buyer, ICG was responsible for

providing the schedules of the items to be purchased, ICG did provide the lists to FTI, (Powers

Depo, pp. 15-16, 20-21, Esty Depo, pp. 112, 250), FTI had not promised to review and revise the

schedules on ICG's behalf (Esty Depo, p. 177), but Mr. Esty simply failed to verify that the final

schedules included all the items provided on ICG's list.

ICG takes the position that the Alpha Lease was a purchased asset under the Final APA

because it was not listed as an Excluded Asset.  Perhaps ICG bases this position on the language

of Paragraph 2.1 which states that "Sellers shall sell.... all of the assets of Sellers, except for the

Retained Assets, including but not limited to the following:..." This language is not helpful to ICG, however, as the Debtors no longer had an interest in the Alpha Lease. Moreover, Paragraph 2(g)(i) is the specific paragraph dealing with assumed real property leases. The specific clear, unambiguous language of Paragraph 2.1(g)(i) is that only those items in effect on the Sale Date **and** those items listed on the attached schedule are to be sold or assumed. This clause does not say that Debtors are selling any contracts that are not Excluded or Retained, but rather states that the contracts to be sold or assumed are those that are affirmatively set forth on the attached schedule. Paragraph 2.1(g)(i) is more specific than the generalization in Paragraph 2.1, and this specific provision trumps the general provision. "It is well settled that a special or more particular clause must prevail over a general clause." *Western Oil Fields, Inc. v. Pennzoil United, Inc.*, 421 F. 2d 387, 389 (5th Cir. 1970) (citations omitted). "Under well established rules of contract interpretation, a contractual clause must be read in its context, and a 'subsequent specification impliedly limits the meaning of a preceding generalization.'" *Friedrich v. Local No. 780, IUE-AFL-CIO-CLC*, 515 F.2d 225, 227 (5th Cir. 1975)(citations omitted); *see also, Baton Rouge Oil and Chemical Workers Union v. ExxonMobil Corporation*, 289 F.3d 373, 376 (5th Cir. 2002) ("It is a fundamental axiom of contract interpretation that specific provisions control general provisions."). Therefore, the specific provision of Paragraph 2.1(g)(i) controls the general provision of Paragraph 2.1, and because the Alpha Lease was not listed on the attendant schedule, it was not purchased/assumed.

**D.    ICG Could Not Have Relied Upon Any Alleged Representations that Debtors Were Selling the Alpha Lease.**

As set forth above, ICG had actual as well as constructive knowledge that the Alpha Lease had been terminated and rejected. It cannot now claim that it relied upon any alleged statements or representations that Debtors were selling the Alpha Lease to ICG. Actual

knowledge is inconsistent with the claim that a party has been deceived and it negatives the essential element of reliance upon the truth of the misrepresentations. *Koral Industries, Inc. v. Security-Connecticut Life Ins. Co.*, 788 S.W.2d 136 (Tex. App- Dallas, 1990 writ denied).

Mr. Esty admitted that the Final APA did not make any representations that all leases were still in effect. Esty Depo at pp. 122-123. He also admitted that leading up to the sale, Debtors did not fail to provide any information that was requested by ICG. Esty Depo at p. 240. Furthermore, Bob Esty could not identify any information prior to closing the Final APA that was withheld from ICG or misrepresented to ICG; rather Mr. Esty could only identify certain accounting software and information that was allegedly withheld after the sale "that would hinder us from ever being successful." Esty Depo at pp. 239-240.

Mr. Powers stated that he did not believe that FTI or Jay Bilden had lied to him. Powers Depo at pp. 50-51. Furthermore, he only assumed that the Alpha Lease was in effect because the Ensign Peak tower was listed as an asset prior to the execution of the Originally Filed APA, but he did not identify any steps he took to verify the validity of the lease. Powers Depo, pp. 12-17, 20-25, 35-40.

ICG admits that it did not conduct any additional due diligence between the date the Originally filed APA was to have closed and the date the Final APA closed. (See Bilden Depo at p. 20 and Powers Depo at pp. 72, 78) If ICG had finalized and closed the transaction in May, as was originally contemplated, the Alpha Lease would have still been in effect. However, because of the delay caused by ICG itself – due to its bidding at an auction in the bankruptcy court without having secured adequate financing – by the time the transaction was finally closed on July 23, the Alpha Lease had been rejected. By its own admission, ICG did nothing to ensure that the assets it had planned to purchase in May were still in existence by the end of July. There

has been no evidence whatsoever, that Debtors did anything to prevent ICG from learning of the

rejection of the Alpha Lease. Indeed, as set forth above, ICG and its counsel were present in the

courtroom when it was announced in open court that the Alpha Lease had been rejected.

**E.     ICG Released or Waived Any Claims It Had Against Debtors for Breach of Representations.**

Paragraph 11.2 of the Final APA states that "all representations and warranties made by

the Sellers in this Agreement shall terminate on the Closing Date upon the purchase of the

Purchased Assets by Buyer, and Sellers shall have no liability after the Closing Date or any

breach of any representation or warranty." ICG claims that Debtors breached the Final APA by

breaching the representation that it was selling a valid Alpha Lease for the Ensign Peak property.

Even if Debtors had made such representation, under Paragraph 11.2, Debtors have no liability

for any such breach. Thus, by accepting this provision of the Final APA, ICG is precluded or

estopped from bringing an action against Debtors for any breach of any representation or

warranty. Bob Esty admitted that he was aware that under the Final APA all representations and

warranties fall away at closing. Esty Depo at p. 260.

Furthermore, ICG also signed a Release, dated July 23, 2004, as part of the closing of the

Final APA in which ICG released Debtors (and other parties) from

> all direct or indirect, vested or contingent, known or unknown,
> suspected or unsuspected, claims, demands, actions, causes, suits
> and damages whatsoever, at law or in equity, in tort, contract or
> otherwise, that the Releasing Party and its respective affiliates,
> successors and assigns, ever had or now have, for or by reason of
> any statute, regulation, negotiation, contract, transaction,
> document, agreement, matter, cause or thing whatsoever, including
> without limitation actions for breach of contract, fraud,
> misrepresentation, interference, duress, prima facie tort, breach of
> fiduciary duty, usury, partnership, joint venture or the ordinary,
> sole, contributory, comparative or concurrent negligence of any
> Released Party (the "Released Claims"); provided, however, that
> nothing contained in this release shall affect any rights or

> obligations of the parties under the Term Sheet, or any of the
> related documents or asset purchase agreements to be executed or
> delivered by any party in connection with, pursuant to or
> contemplated by the Term Sheet, and the same shall not be
> included in the Released Claims.

See Release located in the Appendix at Tab 14.

Under this Release, ICG released Debtors from all claims other than the enforcement of

the APA itself. Bob Esty acknowledged that by executing the release, ICG was releasing all

claims against the Released parties save and except the enforcement of the asset purchase

agreement itself. Esty Depo at p. 233. It is disingenuous for ICG to now bring an action based

on claims that are not a part of the enforcement of the APA. It has released all such claims, and

the Release is enforceable.

**F.    ICG has Produced No Evidence that Debtors Made Representations that the Alpha
Lease and the Transmission Equipment Were Assets Being Sold to ICG Under the
Final APA, and Summary Judgment Should be Granted Pursuant to Fed. R. Civ. P.
56(e).**

As set forth in detail above, ICG has not produced evidence that Debtors made any

representations that the Alpha Lease and the Transmission Equipment were assets to be sold

under the Final APA. In fact, the evidence shows that ICG admits that there were no such

representations. Bob Esty admitted that the APA itself did not make any representation that all

leases were still in effect. Esty Depo pp. 122-123. Ray Powers only testified that he assumed

that the leases relating to the towers on a list given to him by Debtors were assets to be sold. He

did not testify that anyone told him that the leases were still in effect. In fact, at the time the

original lists were prepared – using the information provided to ICG in May 2004 – the Alpha

Lease was in effect. It was not until **after** the Originally Filed APA was executed (when, as ICG

admits, "the dog caught the bus") that the Alpha Lease was rejected. ICG and its counsel had

actual and constructive knowledge of its rejection, and they did nothing in the way of due

diligence to assure that leases that were in effect in May 2004 were still in effect in July 2004. There is simply no evidence that at the time of the closing of the Final APA Debtors represented that the Alpha Lease was a valid and enforceable lease. There has been adequate time for discovery and under Fed. R. Civ. P. 56 (e), since ICG cannot bring forth some proof on the essential elements of its claim, summary judgment should be granted against ICG's claims relating to Ensign Peak.

## IV.

### CONCLUSION

Summarily, for the reasons stated above, Plaintiffs are entitled to summary judgment on ICG's counterclaim for damages related to the Ensign Peak tower. The Debtors made no representations or warranties that the Ensign Peak tower would be included in the sale, ICG had both actual and constructive knowledge that the Ensign Peak tower lease had been rejected and thus could not have justifiably relied upon any such representations or warranties had they been made and further ICG released any such claims both within the Final APA and in the attached Release. ICG's claims are nothing more than a continuation of their efforts to renegotiate the APA and to avoid the resulting damage, if any, of their almost total lack of due diligence and care in connection with the transaction.

Respectfully submitted,

BAKER BOTTS L.L.P.

Judith W. Ross
State Bar No. 21010670
C. Luckey McDowell
State Bar No. 24034565
Rachel Doyle
State Bar No. 06096300
2001 Ross Avenue
Dallas, TX 75201
Telephone: 214.953.6500
Facsimile: 214.953.6503
Email:       *judith.ross@bakerbotts.com*
             *luckey.mcdowell@bakerbotts.com*
             *rachel.doyle@bakerbotts.com*

**COUNSEL TO DEBTORS-IN-POSSESSION**

BAKER & MCKENZIE LLP

David W. Parham (permission)
David W. Parham
State Bar No. 15459500
Laurie Dahl Babich
State Bar No. 00796150
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201
Telephone: 214.978.3000
Facsimile: 214.978.3099

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing motion and brief (only) was served via facsimile on the party listed below this 30th day of December 2004.  A copy of the motion and brief as well as the appendix was served via certified mail, return receipt requested.

Ryan Downton
Andrews & Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:214.659.4576
Facsimile: 214.324.5259
Email: *ryandownton@andrewskurth.com*

**COUNSEL TO INTERNATIONAL COMMUNICATIONS GROUP, INC.**

Rachel Doyle