William G. Compton
Texas State Bar No. 04652350
Monica S. Blacker
Texas State Bar No. 00796534
Ryan H. Downton
Texas State Bar No. 24036500
**ANDREWS KURTH LLP**
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:      (214) 659-4400
Facsimile:      (214) 659-4401
**COUNSEL FOR INTERNATIONAL COMMUNICATIONS GROUP, INC.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CORBAN COMMUNICATIONS, INC. | § | Case No.  04-32972-SAF-11 |
| and COLORADO 4-19 NETWORK, INC., | § | |
| | § | Chapter 11 |
| Debtors. | § | (Jointly Administered) |
| | § | |
| CORBAN COMMUNICATIONS, INC., | § | |
| COLORADO 4-19 NETWORK, INC., and | § | |
| THE OFFICIAL COMMITTEE OF UNSECURED | § | |
| CREDITORS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Adversary No. 04-03543 |
| | § | |
| INTERNATIONAL COMMUNICATIONS | § | |
| GROUP, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| INTERNATIONAL COMMUNICATIONS | § | |
| GROUP, INC., | § | |
| | § | **DEFENDANT'S RESPONSE TO** |
| Counter-Plaintiffs, | § | **PLAINTIFFS' MOTION FOR** |
| | § | **SUMMARY JUDGMENT** |
| vs. | § | |
| | § | |
| CORBAN COMMUNICATIONS, INC. | § | |
| AND COLORADO 4-19 NETWORK, INC., | § | |
| | § | |
| Counter-Defendants. | § | |

## TABLE OF CONTENTS

I.   **TABLE OF CONTENTS** ................................................................................ ii

II.  **TABLE OF AUTHORITIES** ........................................................................ iii

III. **SUMMARY OF ARGUMENT** ....................................................................... 1

IV.  **FACTUAL BACKGROUND** ......................................................................... 2

V.   **ARGUMENT AND AUTHORITIES** ............................................................. 4

      A.   The "As Is" Provisions of the Final APA
           Do Not Preclude ICG's Claims ................................................................ 4

      B.   The Alpha Lease and Transmission Equipment Were
           Omitted From the Final APA Schedules by Either Mutual
           or Unilateral Mistake ................................................................................ 7

      C.   ICG Reasonably Relied on Debtors' Representations
           That They Were Selling the Alpha Lease ................................................ 8

      D.   ICG Did Not Release or Waive Its Claims Against Debtors .................... 9

      E.   ICG Has Produced Evidence that the Alpha Lease and
           Transmission Equipment Were Assets Being Sold to
           ICG Under the Final APA ......................................................................... 11

VI.  **CONCLUSION** ............................................................................................. 12

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Brady v. Johnson,*
    512 S.W.2d 359, 361 (Tex. Civ. App.– Austin 1984, no writ _____ 10

*IT Corp. v. Motco Site Trust Fund,*
    903 F.Supp. 1106, 1134 (N.D. Tex 1994)_____ 10

*Larsen v. Carlene Langford & Associates,*
    41 S.W.3d 245, 253 (Tex. App.- Waco 2001, pet. denied)_____ 6

*Oilwell Div., United States Steel Corp. v. Fryer,*
    493 S.W.2d 487, 491 (Tex. 1973) _____ 10

*Prudential Ins. Co. of America v. Jefferson Associates, LTD,*
    896 S.W.2d 156,161 (Tex. 1995)_____ 4-5

*Schmaltz v. Walder,*
    566 S.W.2d 81, 84 (Tex. Civ. App.-Corpus Christi 1978,
    writ ref'd n.r.e.) _____10

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant International Communications Group, Inc. ("ICG"), by and through its attorney of record, and files this its Response to Plaintiffs' Motion for Summary Judgment and would show the Court as follows:

## SUMMARY OF ARGUMENT

1.    ICG's counterclaim regarding the Ensign Peak property in Utah is two-pronged. First, Debtors misrepresented the status of the Alpha Lease (as defined in Debtors' Motion for Summary Judgment). Second, Debtors purported to sell certain Transmission Equipment (as defined in Debtors' Motion for Summary Judgment) to ICG when Debtors no longer owned such equipment. Debtors' Motion for Summary Judgment covers both aspects of ICG's counterclaim.

2.    The Debtors breached the Final APA because the agreement purported to sell certain assets to ICG (including the Transmission Equipment) and assign other assets to ICG (including the Alpha Lease), when Debtors, in fact, had no rights in such assets.

3.    The Debtors' Motion for Summary Judgment claims that ICG's claims are invalid for a variety of reasons, namely: a) the assets were sold "as is;" b) the language of the Final APA does not include the Alpha Lease and Transmission Equipment; c) ICG knew the Alpha Lease had expired; d) ICG waived its claims; and e) ICG has produced no evidence that the Debtors' represented to ICG that the Alpha Lease and Transmission Equipment were included in the sale.

4.    The Debtors are wrong on all counts: a) ICG was fraudulently induced into signing the APA by Debtors' material misrepresentations and an "as is" clause goes to the quality of a good, not its existence; b) the Alpha Lease was omitted from the Final APA by either

mutual or unilateral mistake; c) ICG had no knowledge the Alpha Lease had expired; d) Debtors'

waiver argument fails because of the above referenced fraudulent inducement; and e) ICG has

evidence that the Debtors represented that the Alpha Lease and Transmission Equipment would

be included in the sale.

5.      In support of its Response, ICG relies on the pleadings on file, the affidavit of

Monica Blacker (Appendix Tab 1), the deposition testimony of Robert Esty (Appendix Tabs 2

and 3), the deposition testimony of Jay Bilden (Appendix Tab 4), the deposition testimony of

Ray Powers (Appendix Tab 5), the deposition testimony of Hal Thomas (a reporter's rough draft

is attached at Appendix Tab 7), the Initial APA (as defined below) (Appendix Tab 8), the Final

APA (as defined below) (Appendix Tab 9), and the presentation of FTI to the Court on July 20,

2004 (Appendix Tab 10).    All of which are incorporated herein by reference, with relevant

portions attached as an appendix to this Response.    Despite a diligent effort, ICG has not yet

been able to take the deposition of a representative of the Debtors' agent, FTI.  Such a deposition

is expected to take place next week and is likely to produce more evidence supporting ICG's

claims.

## FACTS

6.      In March 2004, Corban Communcations, Inc. ("CCI"), Colorado 4-19 Network,

Inc. ("Colorado 4-19"), and Corban Towers, Inc. ("CTI") filed petitions in bankruptcy.

7.      On or about May 25, 2004, this Court orally approved the sale of the assets of CTI

and Colorado 4-19, along with the stock of CTI to ICG, pursuant to an Asset Purchase

Agreement that was filed with the Court on May 25, 2004 (the "Initial APA").

8.      The Initial APA contemplated the transfer of the entire network of microwave

towers operated by the Debtors and all leases for use of the land on which the towers are located,

including the Ensign Peak tower at Salt Lake City, Utah (the "Entire Network").  Debtors' MSJ

at Paragraph 12.

9.      As ICG later discovered, the Debtors' lost their right to use the Entire Network on

or around June 11, 2004, as the lease for use of the Ensign Peak tower at Salt Lake City (the

"Alpha Lease") was terminated by operation of law on such date.  On information and belief, the

Debtors also no longer owned the Transmission Equipment as it became the property of the

Alpha lessor by operation of Utah law on the same date.  Esty Deposition at 118-119.  Despite

the inclusion of the Alpha Lease on the schedules attached to the Initial APA, Debtors failed to

disclose to ICG at that time (or any other time) that the Alpha Lease had been terminated.

Thomas Deposition at 220-221.

10.     The Initial APA was scheduled to close on or around June 23, 2004, but failed to

close as scheduled.  Bidding was reopened by the Court and sale hearings were scheduled for the

week of July 19, 2004.

11.     In the second round of bidding, the Court once again determined that ICG

submitted the highest and best bid, and another Asset Purchase Agreement was executed on July

21, 2004 (the "Final APA").   Once again, the Final APA contemplated sale of the Entire

Network, as represented to the Court by the Debtors' agent (FTI) on July 20, 2004.  Thomas

Deposition at 198-201.  FTI was the Debtors' agent during the bankruptcy process and the

Debtors admit they were responsible to make sure FTI presented accurate information to the

Court. Thomas Deposition at 110, 111, 141, 161.

12.     Both the Court and ICG relied on statements of Debtors' representative and

former President, Hal Thomas, along with the statements of FTI and, thus, believed it was

purchasing the Transmission Equipment located on the Ensign Peak tower pursuant to the Final

APA.  Mr. Thomas confirmed in his deposition that he still believes he sold the Transmission

Equipment to ICG pursuant to the Final APA.  Thomas Deposition at 253-254.

13.    At no time did the Debtors or the Debtors' agent communicate to ICG or any ICG

representative that the Alpha Lease had been, even after another potential purchaser contacted

Debtors regarding the Alpha Lease.  Debtors' MSJ at Paragraph 37.  In fact, the Debtors

communicated just the opposite – that the Entire Network was still intact, as shown by Debtors'

presentation to the Court the day before the Final APA was executed.  ICG, of course, had no

actual knowledge that the Alpha Lease was terminated until after the final closing.

14.    The representations made by Debtors to the Court were material and ICG relied

on the Debtors' express representations in formulating their bid and executing the APA.  Esty

Deposition at 122, Powers Deposition at 89.

## ARGUMENT AND AUTHORITIES

15.    Each of the Debtors' arguments for why they are entitled to summary judgment

on Defendant's breach of contract claims regarding the Alpha Lease and the Transmission

Equipment fails because, at a minimum, there are material facts in dispute regarding the validity

of Defendants' claims.

**A.    The "As Is" Provisions of the Final APA Do Not Preclude ICG's Claims**

16.    In their Motion for Summary Judgment, Debtors assert that ICG's contract claims

are barred because of the "as is" clause in the Final APA.  More specifically, relying on

*Prudential Ins. Co. of America v. Jefferson Associates, LTD*, 896 S.W.2d 156, 161 (Tex. 1995),

Debtors assert that the "as is" clause negates one of the elements of ICG's claim, namely

"causation."

17.    Debtors' interpretation of *Prudential*, however, tells only part of the story.

*Prudential* also states that a buyer is <u>not</u> bound by agreement to purchase something 'as is' when

he is induced to enter into the agreement because of a fraudulent representation or concealment of information by the seller. *Id.* at 369. As discussed below, the Debtors' representative made such a fraudulent representation regarding the Alpha Lease.

18.     In their Motion for Summary Judgment, Debtors state that "ICG must come forth with evidence that the Debtors fraudulently misrepresented to ICG that the Alpha Lease was a valid contract that was to be sold to ICG. . ." Debtors' MSJ at p. 20. ICG has done just that. Indeed, ICG has come forward with such evidence because, on July 20, 2004, the Debtors' representative (FTI) told both ICG and the Court that ICG would be buying the Entire Network intact. Thomas at 198-201, Appendix Tab 10. This testimony is undisputed. It is also undisputed that FTI was the Debtors' agent during the bankruptcy process and it was the Debtors' responsibility to make sure FTI presented accurate information to the Court. Thomas Deposition at 110, 111, 141, 161. Such a representation was false at the time it was made because the Alpha Lease had already been rejected by the Debtors. FTI also included the Alpha Lease on the working schedule of leases to be sold to a buyer and failed to correct the schedules once the lease was rejected. Bilden Deposition at 36-37. Further, ICG's president, Bob Esty, testified that ICG relied on FTI's representations in closing the Final APA. Esty Deposition at 122.

19.     In his deposition, Mr. Thomas claims that the network remained intact despite the termination of the Alpha Lease because, even after termination, the owner of the land "never said I couldn't use it" and "never terminated, stopped, interfered with the site." Thomas Deposition at 221. Such a claim is ridiculous on its face; after the owner of the Ensign Peak land went to the trouble of getting the Alpha Lease terminated by operation of law, it was unreasonable for Mr. Thomas to assume that the owner of the land would simply allow a buyer to continue leasing the

land under the old terms.  Further, Mr. Bilden, an employee of the Debtors at the time of the negotiation and execution of the Final APA testified that the Ensign Peak tower was very important to the operation of the network.  Bilden Deposition at 34-35.  Mr. Bilden was the chief engineering officer of the Debtors and even Mr. Thomas admits he was the person most knowledgeable as to the impact on the network if the Ensign Peak lease was lost.  Thomas Deposition at 219.

20.     While ICG has not pled fraudulent inducement as an affirmative claim,

"in the context of a summary judgment proceeding, fraudulent inducement is in the nature of a counter-defense responding to the defense raised by the seller. The defense raised by the seller is that the buyer's injuries were not caused by the seller because the buyer did not rely on the seller's representations.  To successfully raise the counter-defense of fraudulent inducement the buyer must present some summary judgment evidence that "but for" the representations of the seller regarding the condition of the  subject of the contract, the buyer would not have assented to a contract which contained an "as is" clause."

*Larsen v. Carlene Langford & Assocs.*, 41 S.W.3d 245, 253 (Tex.App.—Waco 2001, pet. denied).

In this case, Mr. Esty testimony regarding his reliance on FTI's presentation constitutes such "but for" evidence.  Esty Deposition at 122.

21.     Further, an "as is" clause is only effective as to goods that actually exist at the time of sale.  The "as is" clause goes to the quality of the goods sold, not the existence of the goods.  It is undisputed that the Alpha Lease was not in effect at the time of sale; therefore, the "as is" clause is irrelevant to a determination of whether or not Debtors breached the Final APA with regard to the Alpha Lease.  Esty Deposition at 122-123.

22.     On any fair reading of the evidence, there is also a fact issue regarding whether or not Debtors owned the Transmission Equipment they purported to sell to ICG.  Esty at 118-119.  If they no longer owned the Transmission Equipment, as Mr. Esty testified, than the "as is" clause is irrelevant to a determination of whether or not Debtors breached the Final APA with

regard to the Transmission Equipment. Debtors simply breached their contract with ICG by failing to deliver to ICG an ownership interest in an asset they purported to sell: the Transmission Equipment.

**B.   The Alpha Lease and Transmission Equipment Were Omitted From the Final APA Schedules by Either Mutual or Unilateral Mistake**

23.    It is undisputed that the Alpha Lease did not appear on the appropriate schedule of the Final APA. However, it is also undisputed that none of the tower leases for the entire west coast region of the network (including the Alpha Lease) appeared on the schedules of the Final APA. Esty Deposition at 124, 193-195. No one disputes that ICG intended to purchase the Entire Network, although Mr. Thomas implausibly claims he never knew exactly what ICG intended, although "it would have been strange" if they did not assume any west coast leases. Powers Deposition at 89; Esty Deposition at 40, 117, 124; Thomas Deposition at 206, 224. Debtors were clearly aware of ICG's intention, as shown by the Initial APA and FTI's presentation to the Court on July 20, 2004. Esty Deposition at 257-260. As the west coast region of the country is part of the Entire Network, it is obvious that the schedules showing the west coast assets were mistakenly omitted from the Final APA.

24.    Further, Debtors' admit that schedules showing assets related to the Entire Network (including the west coast region) were attached to the Initial APA. Debtors' MSJ at Paragraph 12. Mr. Powers (of ICG) testified that no new schedules were prepared between the failed closing of the Initial APA and the closing of the Final APA. Powers Deposition at 71-77. The same schedules were e-mailed to Debtors' counsel on July 20, 2004. Blacker Affidavit at Paragraph 5. The failure to include the schedules was brought to Debtors' attention as soon as it was discovered after the closing of the Final APA.

25.     In short, Debtors' argument that the Alpha Lease was not listed on any schedule to the Final APA is not persuasive as a basis for avoiding ICG's claim because, one, Debtors knew that ICG intended to include the Alpha Lease and, two, ICG provided the Debtors' with schedules that included the Alpha Lease.

**C.      ICG Reasonably Relied on Debtors' Representations That They Were Selling the Alpha Lease**

26.     There is no evidence that ICG had any knowledge that the Alpha Lease had been terminated and rejected prior to closing of the Final APA.  Debtors try to conjure up an argument that ICG somehow had constructive knowledge based on a hearing on July 15, 2004.  The ICG lawyer who attended that hearing did not participate in any hearing regarding the termination of the Alpha Lease.  Blacker Affidavit at 3.  In fact, no testimony was offered that day regarding the Alpha Lease.  Instead, there was merely a one sentence request for a stipulation by an attorney appearing by telephone.  See Appendix Tab 6: relevant portions of 7/15/04 hearing transcript. Debtors' counsel stated that she could not dispute the request.  See Appendix Tab 6: relevant portions of 7/15/04 hearing transcript.   Because there was no evidence presented, no discussion of the issue, and no Order submitted to the Court on the matter until well after the closing of the Final APA, it seems a stretch to say that ICG should have immediately seized on the significance of a single sentence by a lawyer appearing by telephone in the middle of an extended hearing and, thus, immediately recognize that a lease important to the integrity of the network had been terminated.  The Debtors certainly said nothing to ICG and it takes real "chutzpah" for them now to argue that ICG should be charged with "constructive notice" of a critical loss of value for the estate based on a passing comment by a person on the telephone.

27.     The Debtors knew that ICG was relying on the same schedules that were used in the Initial APA, including the schedule containing the Alpha Lease.  In fact, such schedules were

e-mailed to Debtors' counsel on July 20, 2004.  Blacker Affidavit at 5; Thomas Deposition at

202-206.  As of that date (if not earlier), Debtors had actual knowledge that ICG believed it was

acquiring the Alpha Lease, but failed to correct that mistaken belief.

28.    The Debtors also knew that ICG considered the Ensign Peak tower and

Transmission Equipment critical to the operations of the network because Jay Bilden, the

Debtors' representative, told ICG that the tower and equipment were critical.  Bilden Deposition

at 34-35.

29.    Despite knowledge that the Alpha Lease had been rejected and that ICG

considered the Alpha Lease critical to operations of the network, Debtors continued to represent

to the Court that the Entire Network would be sold intact to ICG as late as July 20, 2004 – the

day before the Final APA was executed.  Esty Deposition at 257-260.

30.    In the face of their false representations and knowledge of ICG's reliance,

Debtors had a duty to tell ICG that the Alpha Lease had been rejected prior to closing of the

Final APA.  Hal Thomas, the Debtors' representative, admitted in his deposition that he never

informed anyone at ICG that the Alpha Lease had been terminated and rejected.  Mr. Esty

affirmatively testified that ICG relied on such representations in entering the Final APA and

Debtors' argument that ICG did not rely on is so much hot air.  Esty Depostion at 122, 265.

**D.    ICG Did Not Release or Waive Its Claims Against Debtors**

31.    Debtors next argument is that ICG released or waived its claims against Debtors.

Such a claim is an affirmative defense and the burden of proof is on Debtors.

32.    It is well settled that a release executed in reliance upon a fraudulent

representation is invalid. *IT Corp. v. Motco Site Trust Fund*, 903 F. Supp. 1106, 1134 (N.D. Tex.

1994); *Schmaltz v. Walder,* 566 S.W.2d 81, 84 (Tex. Civ. App.--Corpus Christi 1978, writ ref'd

n.r.e.); *Brady v. Johnson,* 512 S.W.2d 359, 361 (Tex. Civ. App.--Austin 1984, no writ).

33.     The elements of fraud in the inducement are as follows: "(1) That a material

representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was

false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that

he made it with the intention that it should be acted upon by the party; (5) that the party acted in

reliance upon it; and (6) that he thereby suffered injury." *Oilwell Div., United States Steel Corp.*

*v. Fryer*, 493 S.W.2d 487, 491 (Tex. 1973).

34.     ICG's evidence on the inducement question is equally straight forward:

1.     The Debtors made a <u>material representation</u> through their representative
       FTI – that the Alpha Lease was still in effect.  Esty at 122.

2.     The representation was <u>false</u> – the Alpha Lease had been terminated.

3.     <u>Debtors knew that the representation was false</u> when it was made, even if
       they hadn't conveyed it to FTI.

4.     <u>Debtors intended for ICG (and the Court) to rely</u> on their representation –
       the presentation to the Court was during the final hearing prior to
       execution of the Final APA and one of the purposes behind the hearing
       was to publicly explain the differences between the competing bids.

5.     Mr. Esty testified that <u>ICG did in fact rely</u> on the representation in closing
       the Final APA, including the execution of the July 23 release.  Esty
       Deposition at 257-260, 265.

6.     <u>ICG suffered injury</u> due to increased costs to replace the work performed
       by the Ensign Peak tower.  Esty Deposition at 260-261; Bilden Deposition
       at 38-40; Powers Deposition at 84-85.

In short, because of the Debtors' misrepresentation regarding the validity of the Alpha Lease, the

Debtors' waiver and release arguments fail.

35.     With respect to the Transmission Equipment, Mr. Thomas admitted during his

testimony that he intended to sell the Transmission Equipment to ICG and believes he did sell

the Equipment to ICG.  Thomas Deposition at 253-254.  If the Transmission Equipment was no

longer the Debtors to sell, as Mr. Esty testified, then Mr. Thomas' representation to ICG that he

was selling the Transmission Equipment was fraudulent and led to ICG being damaged in an

amount equal to the value of the Transmission Equipment.

   36.  Further, with respect to the breach of contract claims regarding both the Alpha

Lease and Transmission Equipment, ICG's claims are for breach of the APA and, as Debtors'

admit, such claims are specifically excluded from the release.  Debtors' MSJ at 27.

**E.  ICG Has Produced Evidence that the Alpha Lease and Transmission Equipment Were Assets Being Sold to ICG Under the Final APA**

   37.  With regards to the Alpha Lease, ICG offers the following evidence:

- The Alpha Lease was on the working schedule of leases to be sold to a buyer. Bilden Deposition at 36-37.

- The Alpha Lease was included on the schedules for the Initial APA.  Debtors MSJ at Paragraph 12.

- The schedules for the Initial APA, including the schedule containing the Alpha Lease, were e-mailed to Debtors' counsel as schedules to the Final APA in the days prior to closing of the Final APA.  Blacker Affidavit at 5; Thomas Deposition at 202-206.

- As discussed in detail above, some of the schedules, including the schedule containing the Alpha Lease, were inadvertently excluded from the exhibits to the Final APA by either mutual mistake or unilateral mistake.

- Debtors were aware that ICG wanted to acquire the Entire Network and on July 20, 2004, Debtors represented to the Court that the Entire Network would be sold to ICG.

   38.  With regards to the Transmission Equipment, ICG offers the following evidence:

- Debtors intended to sell the Transmission Equipment to ICG.  Thomas Deposition at 253-254.

- Debtors' President still believes he sold the Transmission Equipment to ICG. Thomas Deposition at 253-254.

- The Transmssion Equipment was not listed as a Retained Asset under the Final APA.  Final APA at Section2.2.

- The Transmission Equipment ceased to be the property of the Debtors when the Alpha Lease was terminated on June 11, 2004.  Esty Deposition at 118-119.

39.     Overall, ICG has produced more than enough evidence to defeat the Debtors' Motion for Summary Judgment regarding ICG's breach of contract claims.

## CONCLUSION

40.     At all times, ICG intended to purchase the Entire Network, including the Alpha Lease and Transmission Equipment.  At all times, Debtors were aware of ICG's intention.  The Alpha Lease was specifically included on the Initial APA.  Following the failed closing of the Initial APA, ICG continued in its pursuit of the Entire Network and sent Debtors the same schedules of leases to be assumed.  Despite knowledge of ICG's belief that the Alpha Lease remained in effect and representations to that effect by the Debtors' agent, FTI, the Debtors made no effort to tell ICG that the Alpha Lease was no longer in effect.  The Final APA schedule listing assumed leases mistakenly omitted all west coast tower leases, including the Alpha Lease.

41.     The Debtors' failure to correct a misrepresentation regarding the validity of the Alpha Lease was a material breach of the APA and a defense to the Debtors' claims of release, waiver, and use of the "as is" clause.  At this time, despite the unavailability of FTI's employee for deposition, ICG has produced sufficient evidence and legal argument to defeat Debtors' Motion for Summary Judgment regarding the Alpha Lease and the Transmission Equipment.

42.     There has been testimony in this case that, while the Debtors believed they sold the Transmission Equipment to ICG, it was no longer their property to sell.  Standing alone, the purported sale of equipment that the Debtors did not own is a breach of the APA and is also sufficient to defeat Debtors' Motion for Summary Judgment regarding the Transmission Equipment.

43.     WHEREFORE, ICG requests that the Court deny Debtors' Motion for Summary Judgment and for such other relief to which ICG is justly entitled.

Respectfully submitted,

**ANDREWS KURTH LLP**

By:  /s/Ryan Downton
William G. Compton
State Bar No. 04652350
Monica S. Blacker
Texas State Bar No. 00796534
Ryan H. Downton
State Bar No. 24036500
1717 Main Street, Suite 3700
Dallas, Texas  75201
(214) 659-4400
(214) 659-4401 (Facsimile)

**ATTORNEYS FOR INTERNATIONAL
COMMUNICATIONS GROUP, INC.**

## CERTIFICATE OF SERVICE

The undersigned attorney does hereby certify that a true and correct copy of the foregoing

document was delivered via certified mail, return receipt requested and facsimile on the 21st day

of January, 2004, to the following counsel of record:

Judith W. Ross
Baker Botts LLP
2001 Ross Avenue
Dallas, Texas 75201

David W. Parham
Baker & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201

/s/Ryan Downton
Ryan H. Downton